JAIME A. LEAÑOS, ESQ.
Law Offices of Morales & Leaños
75 East Santa Clara Street, Suite 250
San Jose, CA 95113
Telephone: (408) 294-6800
Facsimile: (408) 294-7102

E-FILING

FILED
2008 MAR 11 P 1:41
RICHARD W. WIEKING
CLERK
U.S. DISTRICT COURT
NO. DIST. OF CA. S.J.

Attorneys for Plaintiff
JEFFREY RODRIGUEZ

ADR

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

JEFFREY RODRIGUEZ,

    Plaintiff,

v.

THE COUNTY OF SANTA CLARA, SANTA CLARA COUNTY OFFICE OF THE DISTRICT ATTORNEY, SANTA CLARA COUNTY CRIME LABORATORY, MARK MORIYAMA, JOHN LUFT, CARMELO RAMIREZ and DOES 1 through 50, inclusive,

    Defendant.

Case No. C08 01377 JF

COMPLAINT FOR DAMAGES

1) 42 U.S.C. §1983 & 1981 (due process & right to counsel)
2) False Imprisonment
3) Negligence
4) Negligent Infliction of Emotional Distress
5) Intentional Infliction of Emotional Distress
6) Malicious Prosecution

[JURY TRIAL DEMANDED]

Plaintiff, JEFFREY RODRIGUEZ, hereby alleges as follows:

I. INTRODUCTION

1. This is a civil action seeking damages arising from the illegal and unconstitutional arrest, prosecution, conviction and imprisonment of Jeffrey Rodriguez ("Rodriguez") by defendants; Santa Clara County ("County"); Santa Clara County Office of the District Attorney ("District Attorney's Office"); Santa Clara County Crime Laboratory ("Crime Lab"); Criminalist Mark Moriyama ("Moriyama"); Deputy District Attorney John Luft ("Luft") and Carmelo Ramirez.

---

*COMPLAINT FOR VIOLATION OF CIVIL RIGHTS*      1

2. As a result of defendants' negligence, willful suppressions of evidence and information fabrication and presentation of false evidence, witness tampering and coercion, and other acts and omissions, Rodriguez was convicted of a robbery he did not commit, was sentenced to twenty-five years in prison, lost five years of his life, and has been damaged irreparably for the remainder of his life.

3. On February 7, 2007, Rodriguez was freed from prison after serving five years. On December 20, 2007, Rodriguez was declared factually innocent. Rodriguez now pursues this action to expose the wrongdoing that led to his incarceration, and to vindicate his civil rights.

## II. JURISDICTION AND VENUE

4. This Court has jurisdiction of the subject matter of this action under 42 U.S.C. Sections 1983 for the deprivation of rights secured by the Sixth and Fourteenth Amendments to the Constitution of the United States. The jurisdiction of this court is predicated upon 28 U.S.C. Section 1331.

5. The Court has personal jurisdiction over each named defendant named herein because the plaintiff is informed and believes and on that basis alleges that each defendant is currently domiciled in the State of California.

6. The court has pendant and supplemental jurisdiction over the state law claims alleged herein pursuant to 28 U.S.C. Section 1367. The pendant state law claims contained in this Complaint arise from the same nucleus of operative facts, and involve identical issues of fact and law, as the federal claims, such that the entire action constitutes a single case appropriate for prosecution as a single proceeding.

7. On or about July 26, 2007, plaintiff presented a written claim for damages with the County defendants pursuant to California Government Code Section 910 et eq. The County issued a Notice of Rejection of Claim on September 14, 2007. This complaint is thus timely and properly commenced on all state claims pursuant to applicable provisions of the Government Code.

*COMPLAINT FOR VIOLATION OF CIVIL RIGHTS* 2

8. Venue is proper in the Northern District of California, under 28 U.S.C. Section 1391(b)(1) and (2) because some or all of the defendants to this action reside in this District and because a substantial part, if not all, of the events or omissions giving rise to plaintiff's claim occurred in this judicial district.

**INTRADISTRICT ASSIGNMENT**

9. Pursuant to Northern District Civil Local Rule 3-29 ( c ), intradistrict assignment to the San Jose Division of the Court is proper because a substantial part of the events or omissions giving rise to the claims herein occurred in the County of Santa Clara.

## III.  PARTIES

10. The plaintiff in this case is Jeffrey Rodriguez and was at all relevant times hereto, a resident of the County of Santa Clara, State of California.

11. Plaintiff is informed and believes and thereupon alleges that defendant Carmelo Ramirez is an individual, and at all relevant times a resident of Santa Clara County.

12. Plaintiff is informed and believes that Defendant County of Santa Clara is a municipal corporation and a political subdivision of the State of California with the capacity to sue and be sued. Plaintiff is informed and believes that Defendant County of Santa Clara is responsible for the administration and oversight of the Santa Clara County District Attorney's Office and the Santa Clara County Crime Laboratory, and includes those agencies/departments.

13. Defendant Santa Clara County District Attorney's Office is an agency of Santa Clara County.

14. Defendant John Luft, sued both in his individual and official capacities, is a resident of California on information and belief, and all relevant times has been a Deputy District Attorney for the Santa Clara County District Attorney's Office.

15. Defendant Santa Clara County Criminal Laboratory is an agency of Santa Clara County.

16. Defendant Mark Moriyama, sued both in his individual capacities, is a resident of California on information and belief, and all relevant times has been a Criminalist for the Santa

Clara County Crime Laboratory.

17. Plaintiff is informed and believes, and thereon alleges, that at all times mentioned herein, each and every defendant was the agent, servant, employee, and/or representative of each and every other defendant and, in doing the things complained of herein, was acting within the scope of that agency, service, employment, and/or representation, and that each and every defendant is jointly and severally responsible and liable to plaintiffs for the damages hereinafter alleged.

18. Plaintiff is ignorant of the true names and/or capacities of defendants sued herein as DOES 1 through 50, inclusive, and therefore sue said defendants by such fictitious names. Plaintiff will amend this complaint to allege their true names and capacities when ascertained. Plaintiff is informed and believes and thereon alleges that each of the Doe defendants is legally responsible and liable for the incident, injuries, and damages set forth herein, and that each of said defendants proximately caused said incidents, injuries, and damages by reason of their violation of constitutional and legal rights, negligence, breach of duty, negligent supervision, management or control, or by reason of other personal, vicarious or imputed negligence, fault or breach of duty, whether severally or jointly, or whether based upon agency, employment or control or upon any other act or omission.

19. Each of the defendants, including Does 1 through 50, caused and is responsible for the unlawful conduct described herein and the resulting injuries by, among other things, personally participating in the unlawful conduct or acting jointly or conspiring with others who did so; by authorizing, acquiescing in or setting in motion policies, plans or actions that led to the unlawful conduct; by failing to take action to prevent the unlawful conduct; by failing and refusing, with deliberate indifference to plaintiff's rights, to initiate and maintain adequate training and supervision; and by ratifying the unlawful conduct that occurred by agents and officers under their direction and control, including failing to take remedial or disciplinary action.

20. In doing the acts and/or omissions alleged herein, defendants (excluding Carmelo Ramirez) and each of them, acted within the course and scope of their employment for the

County of Santa Clara.

21. In doing the acts and/or omissions alleged herein, defendants (excluding Carmelo Ramirez), and each of them, acted under color of authority and/or under color of law.

22. In doing the acts and/or omissions alleged herein, defendants, and each of them acted as the agent, servant, employee and/or in concert with each of said other defendants.

23. All individual defendants are guilty of fraud, oppression, and/or malice that would justify the imposition of punitive and exemplary damages.

## IV. FACTUAL BACKGROUND

### The Robbery of Carmelo Ramirez

24. On December 10, 2001, around 9:00 p.m., in the city of San Jose, County of Santa Clara, Defendant Carmelo Ramirez was robbed at Kragen's Auto Store as he was closing up. A surveillance camera captured the incident on a videotape, showing the incident lasted about 25 seconds.

25. At that time, Carmelo Ramirez, an assistant manager of Kragen's, was working in the back, near doors to the loading dock. The robber threatened Ramirez with a gun, then took his wallet, house keys and car keys. The robber wore a hood over his head. Ramirez called the police immediately thereafter, reported the crime, and gave a description of the suspect.

26. The next day Ramirez went to the DMV to replace his stolen driver's license. Ramirez did not sleep that night; he claimed that he was too terrified.

27. Ramirez looked behind him in line at the DMV and saw plaintiff Jeff Rodriguez standing in line also. Plaintiff is informed and believes that Ramirez then caused the San Jose Police Department to arrest plaintiff because Ramirez felt plaintiff resembled the person who had robbed him the night before. Plaintiff was arrested at the DMV, despite his denials, based on Ramirez's insistence that plaintiff was the person who had robbed him. Plaintiff was later booked into Santa Clara County Jail on a felony charge of armed robbery.

### Discrepancies in Defendant Ramirez's Identification at the Onset

28. Immediately after the robbery, while events were fresh in his mind, Ramirez told the police that he did not know if the robber was Hispanic or Black. Ramirez also said that the robber was only 5'5" tall, an inch taller than himself. Ramirez further described the suspect as "clean shaven" and never mentioned anything about facial hair.

29. Plaintiff is 5'9" tall, obviously much taller than the alleged suspect. At the time of his arrest at the DMV, plaintiff had a goatee and a moustache, in contrast to the robbery suspect, whom Ramirez had described as clean-shaven. Plaintiff is not black. Plaintiff was at home with his family at the time of the robbery. At the DMV, plaintiff did not have on his possession any of the items taken from Ramirez. Plaintiff was wearing white tennis shoes, unlike the suspect who had worn black shoes. Plaintiff asserted his innocence to the police.

30. Following plaintiff's arrest, the police immediately searched plaintiff's home. The police did not find any gun or any of the items taken from Ramirez at plaintiff's house. No black shoes were found at plaintiff's home to match those worn by the suspect. The police seized a black leather jacket from the house, but Ramirez had not stated that the robber had a leather jacket. Notably, the police never bothered showing this jacket to Ramirez until after the first trial. Nevertheless, based on Ramirez's continued insistence that he had correctly identified the man who robbed him, the prosecution of plaintiff proceeded to the next phase.

31. At the preliminary hearing on plaintiff's criminal charges, Ramirez began to change his description of the suspect, and continued to change his descriptions throughout the trials in an effort to secure a conviction against plaintiff. Ramirez knew or should have known, with the exercise of reasonable care, that is initial identification of plaintiff was erroneous, but he nevertheless continued to negligently/recklessly/fraudulently assert that plaintiff was the man who robbed him in order to cover up his original mistake.

### THE FORENSIC ANALYSIS BY MARK MORIYAMA

32. San Jose Police Sergeant Pomeroy, who had been assigned as the primary investigator on the case, went to the scene of the robbery on December 12, 2001, and observed

1  that the area of the robbery had several containers of oil that stood about one and two feet high,
2  and dumpsters with oil in and around them. He also noticed that the jeans worn by plaintiff at
3  the DMV had what appeared to him to be an "oil spot on the left leg at knee level." In a meeting
4  with Ramirez on August 16, 2002, Ramirez told Pomeroy that the area where the robbery took
5  place was messy with oil and had trash bins and oil containers.

6     33.    On August 21, 2002, Pomeroy dropped off plaintiff's jeans to defendant Mark
7  Moriyama. He asked him to specifically examine the jeans for oil stains in an effort to find a link
8  between plaintiff and the crime scene. Moriyama focused on the alleged dark stain previously
9  identified by Pomeroy, located approximately 23 inches from the bottom edge of the pant, in the
10 front, left knee area. To conduct his gas chromatographic test and mass-spectrometric tests,
11 Moriyama took two control samples from **non-stained areas** around the left rear pocket area.
12 He then compared the readouts from the so-called stain area with the readouts from the control
13 sample to first determine whether there was a foreign substance on the jeans.

14    34.    Plaintiff is informed and believes that Moriyama's readouts from the so-called dark
15 stain area matched the readouts from the two non-stained control samples in all significant
16 respects, showing that there were no foreign chemicals or oils in the left knee stain. Rather than
17 state this in his October 2, 2002-report, Moriyama falsely alleged in his report that his tests
18 revealed the presence of motor oil, and "oil or fat of plant or animal origin" in the dark stain in
19 the left knee area. Compounding his error further, Moriyama then reported, without any
20 scientific or factual foundation, that the control samples also contained traces of motor oil.
21 These false statements in Moriyama's report gave the prosecution the only piece of physical
22 evidence that linked plaintiff to the scene of the crime. Moreover, Moriyama's factual
23 conclusions became vital to the prosecution because the prosecution had serious credibility
24 problems from Ramirez's ever-shifting description of the suspect.

25    35.    Plaintiff is informed and believes that Moriyama's report was subjected to a
26 technical review and an administrative review by his superiors at the Santa Clara Crime
27 Laboratory on October 16, 2002, and on October 21, 2002, respectively. Plaintiff is further
28 informed and believes that Moriyama's false statements should have been obvious to his

superiors, who are supposed to have the scientific training and expertise to catch such gross misstatements of fact and flawed analyses. Such supervisor reviews are considered necessary because laymen are not qualified to detect false scientific conclusions of fact such as those rendered by Moriyama. Moriyama's supervisors at the Santa Clara Crime Laboratory negligently, recklessly, and/or intentionally approved a report that should have been rejected by reasonably trained persons in their respective positions.

36. Plaintiff is informed and believes that Moriyama acted negligently, recklessly, willfully and fraudulently in presenting his findings and later in testifying falsely in court about the presence of motor oil and animal/plant fats/oils on plaintiff's jeans. Plaintiff is informed and believes that the Santa Clara Crime Laboratory, which is considered a branch or agency of the Santa Clara District Attorney's Office had a policy and practice of supporting the prosecution's efforts to obtain convictions to the point where it tolerated, encouraged, ratified, and ignored false and misleading reports generated by its staff that were biased in favor of the prosecution.

37. Moriyama's false statements were finally uncovered more than four years later when in contemplation of a third criminal trial in this case, plaintiff's jeans were submitted on November 30, 2006, to the California Department of Justice Bureau of Forensic Services("DOJ") for retesting. As stated in its January 18, 2007-report, the DOJ's lab found, after even more rigorous testing, that the subject dark stain on plaintiff's jeans contained no foreign chemicals or oils. Plaintiff is informed and believes that the DOJ's underlying test data conformed to the data Moriyama received upon his tests, except that the DOJ refused to draw the wrong factual conclusions that Moriyama did, and did not misstate or misrepresent its findings as Moriyama had. This retest was instrumental in plaintiff's obtaining a finding of factual innocence in December 2007.

### THE FIRST TRIAL

38. In February 2003, plaintiff went to trial for the first time on his criminal case. Plaintiff's case was prosecuted by defendant John Luft, who relied on two primary pieces of evidence: the eyewitnesses' identification of Carmelo Ramirez, and the scientific evidence by

Mark Moriyama. By the time of the first trial, Ramirez had already made multiple contradictory pretrial statements describing the appearance of the person who robbed him. He had also admitted to an investigator from the Public Defender's Office that he was not as sure as he claimed to be that the plaintiff was the person who had robbed him. Ramirez refused to concede this at trial, however. The credibility of Ramirez was attacked by defense counsel, but plaintiff is informed and believes that Ramirez nevertheless caused one juror to believe him and vote to convict.

39. Given Ramirez's credibility problems, Moriyama's test results became even more crucial to the prosecution. Moriyama's testimony was the only other evidence linking plaintiff to the scene of the crime. Moriyama testified that plaintiff's jeans were stained in the knee area with a combination of motor oil and/or food oils, implying that plaintiff's jeans were smeared with the foreign substance at the scene of the robbery. His testimony is belied by his own underlying test results, which Moriyama never explained or disclosed to defense counsel. Moriyama knew, or should have known that his false testimony could contribute to an innocent person going to prison. Nevertheless, he negligently, recklessly, fraudulently and willfully hid the fact that his own tests showed that there were no foreign oils on plaintiff's jeans. Moriyama's report misled plaintiff's defense attorney with its conclusory statements that motor oil and food oils had stained plaintiff's jeans. Had Moriyama been truthful, his report could have been used by the defense to show that there was no evidence plaintiff was ever at the oily scene of the robbery. At a minimum, the report would not have been used against the plaintiff.

40. At the time of the first trial, plaintiff had no knowledge that Moriyama's statements were false. On February 28, 2004, the Santa Clara Superior Court declared a mistrial when the jury deadlocked 11-1 in favor of acquitting plaintiff. Plaintiff is informed and believes that Moriyama's false testimony contributed to preventing an acquittal and was crucial to the prosecution. Despite the overwhelming opinion among the jurors that plaintiff was not guilty, the Santa Clara District Attorney's Office and John Luft decided to retry the case. Plaintiff is informed and believes that the Santa Clara District Attorney's Office had an official policy and practice of "winning trials at all costs." Plaintiff is informed and believes that the agency was

deliberately indifferent to the constitutional rights of the accused and condoned, encouraged, and ratified prosecutorial misconduct to maximize its conviction rate and trial victories. Defendant John Luft was trained, and supervised by persons who had willingly enforced and encouraged this policy of tolerance for prosecutorial misconduct.

## THE SECOND TRIAL

41. After the first trial, there was a second trial. Carmelo Rodriguez met with deputy district attorney John Luft and San Jose Police Sergeant Pomeroy on April 17, 2003, a couple of days before the second trial.

42. Plaintiff is informed and believes that in this meeting, the victim was given Rodriguez's black leather jacket to inspect for the first time. This jacket had been confiscated by the San Jose Police two years earlier when Rodriguez's house was searched a day after the robbery in 2001, but it had not been introduced at trial nor mentioned previously as relevant to the investigation. Luft and Pomeroy had the victim watch the surveillance video of the robbery repeatedly and directed Ramirez to review still photographs extracted from the surveillance video. Plaintiff is informed and believes that Luft directed Ramirez to continue comparing plaintiff's leather jacket to the jacket worn by the robber in the video. Eventually, after continued suggestions from Luft that the leather jacket might be the same as the one in the video, Ramirez suddenly "remembers" plaintiff's jacket was the one worn by the robber. Plaintiff is informed and believes that in this meeting, Luft negligently, willfully, recklessly and intentionally coaxed Ramirez to give false testimony in order to solidify the identification of plaintiff as the person who committed the robbery. Plaintiff is informed and believes that Ramirez agreed with this plan, knowing that he would be giving false testimony at the second trial.

43. The story that emerged from this meeting between Pomeroy, Ramirez and Luft accomplished two things for the prosecution. First, it enabled Ramirez to positively connect a piece of plaintiff's clothing to what the robber was wearing. Second, the new story provided an explanation for the prior inconsistencies in Ramirez's description of the suspect's clothing. The new story suggesting that plaintiff's zippered leather jacket, worn over a hooded sweatshirt,

caused the discrepancy in descriptions allowed Ramirez/Luft to reconcile, or explain away Ramirez's conflicting testimony and make a positive identification linking plaintiffs clothing to the robber's.

44. Moriyama appeared also at the second trial and repeated his testimony from the first trial that plaintiff's jeans had been stained by a combination of motor oil and plant/animal oil in the area of the front knee and back pockets. This again placed plaintiff at the scene of the robbery, which was littered with motor oil and food products. Moriyama continued to conceal the fact that his scientific tests were at odds with his trial testimony. His original written report went uncorrected. He provided a second round of false testimony to support the prosecution's case. The efforts by Luft, Moriyama, and Ramirez resulted in a conviction at the second trial.

45. At the conclusion of the second trial, Rodriguez was found guilty in less than one hour. Rodriguez was then sentenced to serve twenty-five years in prison.

**6TH DISTRICT COURT OF APPEAL'S REVERSAL OF CONVICTION**

46. On June 16, 2006, the Sixth District Court of Appeals reversed Mr. Rodriguez conviction and the case was remanded for a third trial.

47. When the case was remanded for a new trial, deputy public defender, Andrew Gutierrez ("Gutierrez"), and a new deputy district attorney, David Pandori ("Pandori"), was assigned to the case. Gutierrez and Pandori undertook a number of key investigations on Rodriguez's case prior to the third trial.

**NEW EVIDENCE DISCOVERED PRIOR TO RODRIGUEZ'S THIRD TRIAL**

1. **Both the District Attorney's Office and the Public Defender's Office jointly re-enacted the crime and agreed that the leather jacket found at Rodriguez's home was not the jacket shown in the Kragen's surveillance video.**

48. On December 26, 2006, the prosecution and defense jointly conducted a robbery reenactment where the surveillance camera videotaped a man of plaintiff's build wearing

Rodriguez's black leather jacket re-enacting the robbery. The goal of the re-enactment was to see if the leather jacket obtained from plaintiff's home would appear identical to the garment worn by the robber in the actual surveillance video.

49. Prosecution and defense investigators, Kragen's Loss Prevention personnel and forensic crime scene expert Greg Stutchman were also present at the re-enactment to ensure that all was done to replicate the crime as closely as possible.

50. One of the issues to be examined was that after the April 17, 2003 meeting with the prosecutor, Ramirez changed his description of the perpetrator's clothing from a sweatshirt to a leather jacket. Ramirez had testified that he recalled seeing distinctive cuffs, seams, and buckles on the perpetrator's coat that matched plaintiff's leather jacket. These distinctive items should have been on the original video if the robber had worn plaintiff's leather jacket.

51. However, after conducting the re-enactment with a Kragen's Loss Prevention officer wearing plaintiff's leather jacket, it was clear that some of the details of that jacket clearly showed up in the videotape of the crime re-enactment, but did not appear on the original video surveillance tape. Had the robber been wearing plaintiff's jacket, those details should have been visible in the original videotape too.

52. Both the prosecution and defense agreed that the only valid conclusion was that the victim was mistaken, and the jacket police seized from plaintiff's home was not the jacket the robber was seen wearing in the surveillance videotape.

53. This re-enactment was one of the reasons Pandori eventually decided to dismiss the charges against plaintiff for insufficiency of the evidence and reasonable doubt. This is also a further strong indication of plaintiff's innocence because it demonstrates the lack of reliability of the prosecution's key witness and the lack of evidence tying plaintiff to the crime scene.

### The Suppression of Exculpatory and Impeachment Evidence

54. Prior to the start of the third trial, Pandori had the tape of plaintiff's initial police interrogation transcribed in an attempt to ascertain what plaintiff had said when he was by himself in the interview room.

55. During this time, plaintiff was unaware that he was being surreptitiously audiotaped. After having the tape transcribed, Pandori turned over the transcription to the defense.

56. According to Pandori, these statements are exculpatory in nature because while alone and unaware that he is being taped, plaintiff, in a whisper, expressed disbelief that the police falsely thought he committed the robbery.

57. This evidence of plaintiff's exculpatory statements had never been turned over by prosecutor Luft during the first two trials.

58. Further, even though Luft had a duty to turn over any materials that could be used to impeach his own witnesses, Luft never turned over the prior conviction and prior bad acts of Carmelo Ramirez that would have been used to impeach his credibility at the first two jury trials. Since Ramirez's credibility was at the heart of the prosecution's case against plaintiff, and Ramirez was one of only two important prosecution witnesses, Luft's failure to turn over this significant impeachment evidence further deprived plaintiff of his right to a fair trial.

59. On February 2, 2007, after more than five years in custody, all charges against Jeff Rodriguez were dismissed for insufficiency of the evidence and reasonable doubt and he was released from actual custody on February 6, 2007.

## V. ALLEGATIONS

**Municipal Liability - Santa Clara County, District Attorney's Office, Santa Clara Crime Laboratory**

60. Upon information and belief, the violations of plaintiff's constitutional and lawful rights complained herein were caused by customs, policies, directives, practices, acts and omissions of authorized policy makers of Santa Clara County, the Santa Clara Crime Laboratory, the Santa Clara County District Attorney's Office. These customs and policies include, but are not limited to failure to adequately provide its district attorneys, including Luft, with sufficient training prohibiting the solicitation and support of perjured testimony, and regarding the preservation and production of exculpatory and/or impeachment evidence during the district

Case5:08-cv-01377-JF   Document1   Filed03/11/08   Page14 of 19

attorney's investigatory role. On information and belief, the customs and policies also include encouraging a "win at cost" approach to obtaining criminal convictions that condoned, and encouraged prosecutorial misconduct. On information and belief, the Santa Clara Crime lab had a policy which tolerated, encouraged, and condoned misleading and false scientific testing, report preparation and testimony at trial, and bias toward the prosecution in disregard of the accused constitutional and legal rights. On information and belief, it also included deliberate indifference to requiring its employees to follow standard testing and report writing protocols to ensure the integrity and accuracy of its reports. Santa Clara County and the Santa Clara County Crime Lab also showed deliberate indifference in their training of Mark Moriyama in regards to his obligation to accurately and truthfully report his findings, to not misrepresents facts and conclusions in aid of the prosecution, and to fully and accurately disclose his test's results even if it may be helpful to the defense. On information and belief, Santa Clara County, including the District Attorney's Office and the Crime Lab, were negligent or reckless in the hiring, training, and supervision of its staff involved in the prosecution of crimes and forensic analysis. The investigation and prosecution leading to plaintiff's imprisonment was conducted negligently, maliciously, oppressively and/or in reckless disregard of plaintiff's constitutional rights.

61.     Upon information and belief, the Santa Clara County District Attorney's Office delegated final policymaking authority to Luft with respect to the investigation of suspects and witnesses. Upon information and belief, the District Attorney's Office did not supervise his activities, and he was not constrained by County policy. Upon information and belief, the District attorney's Office had a policy which encouraged its Crime lab to aid the prosecution to obtain convictions even if it meant providing false and misleading reports and testimony. The District Attorney's office showed deliberate indifference to the supervision, hiring, training, and disciplinary practices of it's Crime Lab even though it has supervisory oversight over the Crime Lab's activities.

62.     In the alternative, upon information and belief, the Santa Clara County District Attorneys's Office authorized, directed, condoned, and/or ratified the unconstitutional and unlawful conduct and/or omissions complained of herein.

63. As a direct and proximate result of the conduct of defendants described herein, plaintiff has been denied his constitutional, statutory and legal rights and has suffered, continues to suffer, and will in the future suffer general and special damages, including but not limited to mental and emotional distress, physical injuries and bodily harm, pain, fear, humiliation, embarrassment, discomfort, and anxiety, loss of familial companionship, medical and related expenses, and lost earnings in an amount according to proof.

### Prosecutor Liability

64. As set forth above, Luft knowingly both concealed and fabricated evidence during the investigative phase that preceded the prosecution. In doing so, Luft acted in an investigatory role rather than as an advocate for the State, and is not entitled to absolute immunity from suit.

65. As a direct and proximate result of the conduct of defendants described herein, plaintiff has been denied his constitutional, statutory, and legal rights, and has suffered, continues to suffer, and will in the future suffer general and special damages, including but not limited to, mental and emotional distress, physical injuries and bodily harm, pain, fear, humiliation, embarrassment, discomfort, and anxiety, loss of familial companionship, medical and related expenses, and lost earnings in an amount according to proof.

66. Defendant's acts were willful, wanton, malicious and oppressive and done with conscious disregard and deliberate indifference for plaintiff's rights.

## VI. CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Violation of the 14th Amendment to the United States Constitution
42 U.S.C. §§ 1983, 1981**

(Against Santa Clara County, including the District Attorney's Office, Crime Lab, and Mark Moriyama and John Luft)

67. Plaintiff re-alleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 59 of this Complaint.

68. Defendants' conduct violated the rights of Jeffrey Rodriguez under the Fourteenth Amendment to the United States Constitution not to be deprived of liberty without due process of law. Said conduct also deprived plaintiff of his sixth amendment right to counsel and right to a fair trial.

69. These violations are compensable pursuant to 42 U.S.C. sections 1983 and 1981.

70. As a result of defendants' conduct, plaintiff has suffered significant physical and emotional harm, loss of his freedom and wages, and pain and suffering.

71. Luft and Moriyama's acts and/or omissions were done willfully, deliberately, maliciously, and with reckless or deliberate indifference or conscious disregard to Jeffrey Rodriguez's constitutional rights, thereby entitling plaintiffs to an award of exemplary or punitive damages.

## SECOND CAUSE OF ACTION

### False Imprisonment

### (Against All Defendants, except Ramirez)

72. Plaintiff re-alleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 59 of this Complaint.

73. Defendants' unlawful conduct resulted in the false imprisonment of Jeffrey Rodriguez.

74. As a direct and proximate result of defendants' actions, plaintiff Jeffrey Rodriguez experienced pain and suffering, severe emotional distress, and the loss of his personal liberty.

## THIRD CAUSE OF ACTION

### Negligence

### (Against All Defendants)

75. Plaintiff re-alleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 59 of this Complaint.

76. Defendants were negligent, and/or reckless and such conduct caused harm to plaintiffs. They had a duty to act with due care to avoid unnecessary or unjustified harm to

plaintiff. The County had a duty to hire, train, and supervise its employees so as not to cause harm to plaintiff and to prevent the violation of plaintiff's constitutional and other legal rights.

77. As a result of defendants' conduct, plaintiff has suffered significant physical and emotional harm, pain and suffering, and the loss of liberty.

78. The acts and/or omissions of Moriyama and Luft, and each of them, as alleged herein occurred in the course and scope of their employment with the County of Santa Clara, and the County is liable for its employees' acts/or omissions pursuant to California Government Code Section 815.2 under the doctrine of respondent superior. They both violated mandatory duties owed to plaintiff.

## FOURTH CAUSE OF ACTION

### Negligent Infliction of Emotional Distress

### (Against All Defendants)

79. Plaintiff re-alleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 59 of this Complaint.

80. Defendants were negligent as stated above, and their negligence was a substantial factor in causing Jeffery Rodriguez to suffer serious emotional distress (including suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, and shock) as he was sentenced to twenty-five years in prison for a crime he did not commit and forced to serve five years in prison before being exonerated.

## FIFTH CAUSE OF ACTION

### Intentional Infliction of Emotional Distress

### (Against All Defendants)

81. Plaintiff re-alleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 59 of this Complaint.

82. Defendants' above-described conduct and/or omissions were extreme unreasonable and outrageous.

83. In engaging in the above-described conduct and/or omissions, defendants intentionally ignored or recklessly disregarded the foreseeable risk that plaintiff would suffer extreme emotional distress as a result.

84. As a direct and proximate result of the conduct of defendants described herein, plaintiff has suffered, continues to suffer, and will in the future suffer general and special damages, including but not limited to, mental and emotional distress, physical injuries and bodily harm, pain, fear, humiliation, embarrassment, discomfort, anxiety, and medical and related expenses and lost earnings in an amount according to proof.

85. Ramirez, Moriyama, and Luft acted with fraud, oppression, and/or malice which justify the imposition of punitive and exemplary damages.

## SIXTH CAUSE OF ACTION

### Malicious Prosecution

### (Against all defendants)

86. Plaintiff re-alleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 59 of this Complaint.

87. Defendants initiated or were actively instrumental in procuring the arrest and prosecution of plaintiff for the robbery of Ramirez in the criminal proceeding against plaintiff. The criminal action terminated in plaintiff's favor with a finding of factual innocence.

88. The defendants acted without probable cause in initiating and maintaining the criminal prosecution.

89. The defendants acted with malice and the malicious actions of the defendants caused plaintiff to suffer injury, damage, loss or harm.

## VII. PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment against all defendants, and each of them, as follows:

1. For general damages against all defendants, jointly and severally, in an amount to be

proven at trial;

2. For special damages against all defendants, jointly and severally, in an amount to be proven at trial;

3. For punitive and exemplary damages against the individual defendants, and DOES 1-50, jointly and severally, in an amount to be proven at trial;

4. For attorneys fees under 18 U.S.C. section 1988;

5. For costs of suit; and

6. For whatever further relief, including injunctive relief, as may be just and proper.

## JURY DEMANDED

Plaintiffs hereby demand trial by jury on any and all issue's triable by a jury.

Dated: March 11, 2008

Law Offices of Morales & Leaños

_____
JAIME A. LEAÑOS
ATTORNEYS FOR PLAINTIFF
JEFFREY RODRIGUEZ